# IN THE UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| MAYOR AND CITY COUNCIL OF BALTIMORE, MARYLAND on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CITIGROUP, INC.; CITIGROUP GLOBAL MARKETS, INC.; UBS AG; UBS SECURITIES, LLC; UBS FINANCIAL SERVICES, INC.; MERRILL LYNCH & CO., INC., MORGAN STANLEY; LEHMAN BROTHERS HOLDINGS, INC.; BANK OF AMERICA CORP.; WACHOVIA CORPORATION; WACHOVIA SECURITIES, LLC; WACHOVIA CAPITAL MARKETS, LLC; THE GOLDMAN SACHS GROUP, INC.; JP MORGAN CHASE & CO.; ROYAL BANK OF CANADA; AND DEUTSCHE BANK, AG,<br><br>Defendants. | Civil Action No. **08 CIV 7746**<br><br>**CLASS ACTION COMPLAINT FOR VIOLATION OF THE SHERMAN ACT**<br><br>**JURY TRIAL DEMANDED**<br><br> |

## INTRODUCTION

1.     Plaintiff, by its undersigned counsel and on behalf of itself and all other members of the class as described herein, brings this action for treble damages and injunctive relief under the antitrust laws of the United States. This action arises out of a conspiracy among Defendants and their co-conspirators that had the purpose and effect of artificially restraining trade in the market for auction rate securities sold by Defendants that were outstanding as of February 13,

2008.

2.        Auction rate securities[1] are debt instruments with long term nominal maturity that are issued at par value. The interest rate is periodically reset via reverse auctions, where bidders submit proposed rates at which they will purchase the auction rate securities. The lowest interest rate at which all sellers of the auction rate securities can be matched to willing buyers becomes the interest rate on the auction rate securities until the next auction is held. The auctions resetting the interest rate are usually held every seven, 28, or 35 days.

3.        With any auction rate security, there exists the possibility that there will not be a sufficient number of buyers to match the number of auction rate securities that holders want to sell in any given auction. If this happens, the auction "fails," i.e., that the holders will not be able to sell their auction rate securities at par value. A failed auction means that the auction rate security becomes illiquid and results in the interest rate defaulting to a higher rate than would likely otherwise result from an auction.

4.        Because the interest rates (or in the case of preferred stock, dividend yields) are reset by these periodic auctions, Defendants unilaterally and collectively represented to investors that auction rate securities were the equivalent of cash or money market funds; were highly liquid, safe investments for short-term investing; and, were suitable for any investor with as little as $25,000 of available cash and as little as one week in which to invest.

5.        Defendants listed auction rate securities as cash management vehicles on statements sent to their investors, even though in reality, they are not cash equivalents and federal regulations prohibit money market funds from investing in auction rate securities. For

---

[1] Auction rate securities are also known as auction rate preferred stock, auction market preferred stock, variable rate preferred securities, money market preferred securities, periodic auction rate securities and auction rate bonds.

example, Citibank listed auction rate securities under the heading of "Money Market and Auction Instruments" on monthly account statements sent to investors and UBS listed them as "Cash Alternative/Municipal Securities" on their statements to clients. Merrill Lynch categorized auction rate securities as "Other Cash" on customer statements and trained its financial advisors to market them as a "cash management tool" to clients.

6.    Defendants knew, however, but did not disclose to investors, material facts about the true liquidity of auction rate securities and about Defendants' role in artificially maintaining the auction market so that auctions did not fail, thereby artificially raising the prices of and stabilizing the market for auction rate securities. Specifically, Defendants did not disclose: (a) that auction rate securities were not cash alternatives, but were, instead, complex, long-term financial instruments with 30 year or longer maturity dates; (b) that auction rate securities were only liquid at the time of sale because Defendants were artificially supporting and manipulating the auction market to maintain the appearance of liquidity and stability; and, (c) that auction rate securities would become illiquid as soon as Defendants stopped supporting and maintaining the auction market.

7.    Even as the market for auction rate securities began to falter with the beginning of the credit crisis in 2007, Defendants acted collusively to maintain and stabilize the market for auction rate securities by purchasing excess supplies in the auctions for which they each acted as broker-dealers. Defendants did so despite the fact that their collective course of conduct required them to increase their inventories of auction rate securities at a time when they all knew of the difficulty that the market was facing given the increasing lack of genuine market demand.

8.    On February 13, 2008, 87% of all auctions of auction rate securities failed when

Defendants and all other major broker-dealers, in a virtually simultaneous manner, refused to continue to support the auctions, as without the artificial support Defendants had been providing, the number of buyers was insufficient to prevent auction failure. As a result of the coordinated boycott withdrawal of support by Defendants and all other major broker-dealers, the market for auction rate securities failed, leaving the holders of more than $300 billion in such securities with no means of liquidating investments that Defendants offered and sold as a suitable alternative to money market funds and other short term cash management vehicles. Consequently, issuers of auction rate securities holding them as of February 13, 2008 were left with illiquid assets that they could not use for their intended purposes or reinvest and which, because the auction market for selling auction rate securities no longer exists, they have little prospect of selling other than at a substantial discount to their par value. In addition, issuers of auction rate securities were obligated to pay a higher interest rate than they would have been required to pay had the auctions not failed. Issuers of auction rate securities suffered antitrust injury as a result, and accordingly, seek damages pursuant to §1 of the Sherman Act.

9.      In support of their Complaint, Plaintiff states upon investigation, information, and belief – except as to the information relating to the representative Plaintiff which is based upon personal knowledge – as follows:

## JURISDICTION AND VENUE

10.     Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. §§ 1331, 1337 and 15 U.S.C. § 15.

11.     Venue is appropriate within this District pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391. The combination and conspiracy charged in this Complaint were carried out in substantial part within this District. The Defendants named herein are found, do business or transact business within this District, and the interstate trade and

commerce hereinafter described are carried out in substantial part within this District.

**PARTIES**

12.    Plaintiff Mayor and City Council of Baltimore, Maryland issued auction rate securities through Defendants or their co-conspirators and held such securities as of February 13, 2008.

13.    Defendant Citigroup, Inc. ("Citigroup") is a Delaware corporation and its principal place of business is located at 399 Park Avenue, New York, NY  10043  At all relevant times, Citigroup was engaged in the sale and purchase of auction rate securities in the United States and in this District.

14.    Defendant Citigroup Global Markets, Inc. is a wholly-owned subsidiary of Defendant Citigroup, Inc., with its principal place of business is located at 388 Greenwich St., New York, NY 10013.  At all relevant times, Citigroup Global Markets, Inc. was engaged in the sale and purchase of auction rate securities in the United States and in this District.

15.    Defendants Citigroup and Citigroup Global Markets, Inc. are collectively referred to herein as "Citigroup."

16.    Defendant UBS AG ("UBS AG") is a Swiss corporation with its principal place of business located at Bahnhofstrasse 45, CH-8001, Zurich, Switzerland and Aeschenvorstadt 1, CH-4051 Basel, Switzerland.  At all relevant times, UBS AG was engaged in the sale and purchase of auction rate securities in the United States and in this District.

17.    Defendant UBS Securities, LLC ("UBS Securities") is a wholly-owned subsidiary of UBS AG , with its principal place of business at 677 Washington Blvd., Stamford, CT  06901. At all relevant times, UBS Securities was engaged in the sale and purchase of auction rate securities in the United States and in this District.

18.    Defendant UBS Financial Services, Inc. ("UBS Financial") is a wholly-owned

subsidiary of UBS AG, with its principal place of business at 800 Harbor Blvd., Weehawken, NJ
07086. At all relevant times, UBS Financial was engaged in the sale and purchase of auction
rate securities in the United States and in this District.

19.     Defendants UBS AG, UBS Securities and UBS Financial are collectively referred
to herein as "UBS."

20.     Defendant Merrill Lynch & Co., Inc. ("Merrill Lynch") is a Delaware corporation
with its principal place of business located at 4 World Financial Center, 250 Vesey Street, New
York, NY 10080. At all relevant times, Merrill Lynch was engaged in the sale and purchase of
auction rate securities in the United States and in this District.

21.     Defendant Morgan Stanley ("Morgan Stanley") is a Delaware corporation with its
principal place of business located at 1585 Broadway, New York, NY 10080. At all relevant
times, Morgan Stanley was engaged in the sale and purchase of auction rate securities in the
United States and in this District.

22.     Defendant Lehman Brothers Holdings, Inc. ("Lehman") is a Delaware corporation
with its principal place of business located at 745 Seventh Avenue, New York, NY 10019. At
all relevant times, Lehman was engaged in the sale and purchase of auction rate securities in the
United States and in this District.

23.     Defendant Bank of America Corp.("Bank of America") is a Delaware corporation
with its principal place of business located at Bank of America Corporate Center, 100 N. Tryon
Street, Charlotte, NC 28255. At all relevant times, Bank of America was engaged in the sale and
purchase of auction rate securities in the United States and in this District.

24.     Defendant Wachovia Corporation ("Wachovia Corporation") is a North Carolina
corporation with its principal place of business located at One Wachovia Center, Charlotte, NC

28288-0013. At all relevant times, Wachovia was engaged in the sale and purchase of auction rate securities in the United States and in this District.

25.   Defendant Wachovia Securities, LLC ("Wachovia Securities") is a subsidiary of Wachovia, with its principal place of business at 1 North Jefferson, St. Louis, MO 63103. At all relevant times, Wachovia Securities was engaged in the sale and purchase of auction rate securities in the United States and in this District.

26.   Defendant Wachovia Capital Markets, LLC ("Wachovia Capital Markets") is a subsidiary of Wachovia, with its principal place of business at 301 College St., Charlotte, NC 28288. At all relevant times, Wachovia Capital Markets was engaged in the sale and purchase of auction rate securities in the United States and in this District.

27.   Defendants Wachovia, Wachovia Capital Markets and Wachovia Securities are refereed to collectively herein as "Wachovia."

28.   Defendant The Goldman Sachs Group, Inc. ("Goldman Sachs") is a Delaware Corporation with its principal place of business located at 85 Broad Street, New York, NY 10004. At all relevant times, Goldman Sachs was engaged in the sale and purchase of auction rate securities in the United States and in this District.

29.   Defendant JP Morgan Chase & Co. ("JP Morgan") is a Delaware corporation with its principal place of business at 270 Park Avenue, New York, NY 10017-2070. At all relevant times, JP Morgan was engaged in the sale and purchase of auction rate securities in the United States and in this District.

30.   Defendant Royal Bank of Canada ("RBOC") is a Canadian corporation headquartered at 200 Bay St., Royal Bank Plaza, Toronto, Ontario, Canada M5J 2J5. RBOC is a bank chartered under Canadian law and in the United States is a financial holding company

pursuant to the Gramm-Leach-Bliley Act.  At all relevant times, RBOC was engaged in the sale and purchase of auction rate securities in the United States and in this District.

31.     Defendant Deutsche Bank, AG ("Deutsche Bank") is a German corporation headquartered at Theodor-Heuss Allee 70,  60486, Frankfurt, Germany.  Deutsche Bank operates in this District through its regional head office, located at 60 Wall St., New York, NY  10005. At all relevant times, Deutsche Bank was engaged in the sale and purchase of auction rate securities in the United States and in this District.

## DEFENDANTS' AGENTS AND CO-CONSPIRATORS

32.     The acts charged in this Complaint have been done by Defendants and were authorized, ordered, and done by their officers, directors, agents, employees, or representatives while actively engaged in the management, direction, control, or transaction of their business or affairs.

33.     Various other persons, firms, and corporations, not named as Defendants in this Complaint, including potentially parents or subsidiaries of the Defendants, have participated as co-conspirators with Defendants in the offenses complained of and have performed acts and made statements in furtherance of the conspiracy.  The identity of all co-conspirators is unknown at this time and will require discovery.

34.     Defendants' actions in furtherance of the alleged conspiracy have damaged Plaintiff and the members of the Class which Plaintiff seeks to represent.

## TRADE AND INTERSTATE COMMERCE

35.     The trade and interstate commerce relevant to this action is the buying, selling, and underwriting of auction rate securities.  The market for auction rate securities has been estimated to exceed $300 billion in the United States.

36.     During all or part of the period during which the events described herein occurred,

each of the Defendants bought and sold auction rate securities in a continuous and uninterrupted

flow of interstate commerce to Plaintiff and the members of the Class as defined herein.

37.     The activities of the Defendants and their co-conspirators, as described herein,

were within the flow of, and had a substantial effect on, interstate commerce.

## CLASS ACTION ALLEGATIONS

38.     Plaintiff Mayor and City Council of Baltimore, Maryland brings this action on its

own behalf and as an action under the provisions of Rules 23(b)(2) and (b)(3) of the Federal

Rules of Civil Procedure on behalf of the following Issuer Class:

> All persons or entities who issued auction rate securities underwritten by Defendants or their co-conspirators between May 12, 2003 and February 13, 2008 (the "Class Period") and who were obligated to make interest payments on those issued auction rate securities as of February 13, 2008. Excluded from the class are Defendants and their affiliates, subsidiaries and co-conspirators.

39.     The members of the Class are so numerous that joinder of all members is

impracticable. While the market for auction rate securities existed, it was estimated to exceed

$300 billion in the United States and, thus, while the exact number of Class members can only be

ascertained through appropriate discovery, Plaintiff believes that there are, at a minimum,

thousands of members of the Class around the United States who issued auction rate securities

through Defendants. While their exact number and identities are presently unknown to Plaintiff,

they are known to the Defendants.

40.     Common questions of law and fact predominate over questions pertinent to only

individual members of the Class because Defendants acted on grounds generally applicable to

the entire class. Such generally applicable conduct is inherent in Defendants' collusion.

41.     Questions of law and fact common to the Class include:

> (A)     Whether Defendants and their co-conspirators engaged in a contract,

combination, or conspiracy to raise, fix, maintain, or stabilize the market for auction rate securities and otherwise restrain trade in the purchase and sale of auction rate securities;

      (B)     The identity of the participants to the contract, combination, or conspiracy;

      (C)     The duration and extent of the contract, combination, or conspiracy alleged in the Complaint;

      (D)     The mechanisms used to accomplish the contract, combination, or conspiracy;

      (E)     Whether Defendants' conduct violated §1 of the Sherman Act;

      (F)     Whether Defendants and their co-conspirators fraudulently concealed the contract, combination, or conspiracy;

      (G)     The effect upon and the extent of injuries sustained by Plaintiff and the Class;

      (H)     The appropriate type and/or measure of damages; and,

      (I)     Whether injunctive relief is necessary to restrain future violations.

    42  Plaintiff's claims are typical of the claims of the members of the Class. All of the members of the Class, like Plaintiff, sustained antitrust injury as a result of Defendants' conspiracy. Plaintiff and the members of the Class members were damaged as a result of purchasing auction rate securities directly from Defendants or their co-conspirators.

    42.     Plaintiff will fairly and adequately protect the interests of the Class and are represented by competent counsel experienced in the prosecution of class action antitrust litigation.

    43.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of

conduct for Defendants.

44.     The Defendants have acted on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.   Defendants Citibank and UBS have already entered into settlements with State Attorneys' General to provide limited relief market-wide to individual investors, demonstrating the predominating commonality of the issues and relief at issue here.

45.     The questions of law and fact common to the members of the Class, including but not limited to the questions identified above, predominate over any questions affecting only individual members.

46.     Class action treatment is superior to other available methods for the fair and efficient adjudication of this controversy.  The Class is readily definable and is one for which purchase records exist.  Prosecution as a class action will eliminate the possibility of repetitious litigation, while also providing redress for claims too small to support the expense of individual complex litigation.  No difficulties are likely to be encountered in the management of this class action that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of this controversy.

## CONSPIRACY ALLEGATIONS

**A.      The Operation of the Auction Rate Securities Market**

47.     Auction rate securities are municipal bonds, corporate bonds, and preferred stocks with interest rates or dividend yields that are periodically reset through auctions, typically seven, 28, or 35 days.  Auction rates securities are usually issued with maturities of 30 years, but the maturities can range from five years to perpetuity.

48.     The current estimated value of auction rate securities in existence is approximately $330 billion.   Investments in auction rate securities were initially limited to

institutional investors, with required minimums of $250,000. In recent years, however, issuers and sellers of auction rate securities have lowered the minimum amount invested to $25,000 in an effort to market auction rate securities as widely as possible to the general public.

49.     Auction rate securities were auctioned at par value. The return on the investment to the investor and the cost of financing to the issuer were determined by the interest rate set through the auction. The method for auctioning the securities was described in the prospectus of the fund through which they were offered, though the formula was substantially similar for all securities offered as auction rate securities. The prospectus also set the number of days between each auction, generally seven, 28, or 35 days. Interest was paid at the end of the auction period.

50.     The auctions held for auction rate securities were reverse or "Dutch" auctions, whereby the price is initially set at a presumably economically unattractive level and then made more attractive as the auction progresses. These reverse auctions involved a series of bids at successively higher interest rates until all of the securities in the auction were sold.

51.     An auction ends when a rate is reached at which all of the securities are sold, and that rate—the "clearing rate"—is the rate that is uniformly set for all of the auction rate securities subject to that auction. The clearing rate is found by determining the lowest rate at which all securities in the auction could be sold.

52.     During an auction, an investor could submit one of four different orders: (a) a "Sell" order, whereby the shares of the auction rate security would be sold in the auction regardless of the clearing rate; (b) a "Bid" order, whereby a bid would be submitted to buy a new position at a specified minimum interest rate; (c) a "Hold" order, whereby the investor would keep its share regardless of the new interest rate set in the auction; (d) a "Hold at Rate" order, whereby shares of the auction rate securities would only be sold if the clearing rate were to be

below the bid to hold rate.

53.    If several bidders in a given auction had bids at the clearing rate and there were more bids than shares, the shares were sold pro-rata among the clearing bidders according to a formula set by the auction agent at the end of the auction.  If all of the current holders decided to hold their securities, then the auction was an "all-hold" auction and the rate was set at a level defined in the prospectus that was generally lower than the market rate.

54.    If there were not enough orders to purchase all of the shares being sold at the auction, the auction "failed."  If an auction failed, the rate defaulted to a "maximum rate" set forth in the prospectus, and which was described by either a formula or a multiplier of a reference rate, such as the Bond Market Association index.  If an auction failed, current shareholders could not sell their shares, no matter what type of order they had issued.

55.    Where an auction failed and the maximum rate was set, issuers of auction rate securities would pay an above-market interest rate on those securities that was higher than they would have paid had the auction cleared at some lower interest rate.

56.    In addition, the maximum rates that would prevail where auctions failed was generally relatively low compared to that of other long-term investment vehicles, particularly for those auction rate securities invested in corporate debt securities or preferred stocks. Accordingly, if the auction failed, owners unable to sell their shares would receive a lower interest rate on an illiquid investment than they might otherwise be able to command for their investment.

57.    The issuer of each auction rate security selected one or more broker-dealers such as Defendants to underwrite the offerings and to manage the auction process.  Investors could only submit orders through the authorized broker-dealers.  The issuer paid an annualized fee to

each broker-dealer engaged to manage an auction, usually approximately 8-25 basis points for the par value of the securities that it managed.

58.     Investors were required to submit an order to the broker-dealer by a deadline set by the broker-dealer, which was usually set early enough so that the broker-dealer had time to process and analyze the orders before having to submit the orders to the auction agent.  Doing so gave the broker-dealer sufficient time to determine what orders, if any, the broker-dealer wished to place for its own account.  By submitting their own orders to purchase or sell shares of auction rate securities for their own accounts, broker-dealers could influence the auction process. Specifically, they were able to prevent auctions from failing where they otherwise might due to insufficient demand.  For example, for the period from January 3, 2006 through May 27, 2008, approximately 5,892 auctions for which Merrill Lynch was the broker-dealer would have failed but for Merrill Lynch's support bid.  Such influence by broker-dealers over the auctions they were overseeing permitted them, collectively, to maintain the market for auction rate securities by preventing auctions from failing and maintaining the appearance that auction rate securities were incredibly liquid.

59.     The typical operation of the auction rate securities market has been diagrammed in the following graphic taken from the *Wall Street Journal*:



**The Mechanics of Auction-Rate Securities**

**❶ Issuing the securities**

**ISSUERS** including municipalities, hospitals and museums, sell auction-rate securities with long maturities to raise money.

**INVESTORS** including individuals, funds, corporations or family trusts, hold them as liquid investments.

**❷ The auction**

**HOLDERS** of auction-rate securities can hold them or sell them.

Days

**THE BANK** holds an auction every 7 to 35 days, resetting the interest rate of the securities and passing them on to new holders.

**NEW INVESTORS** bid to take on securities from existing holders.

**❸ The payment**

**ISSUER** pays interest at the new rate to the winning bidders.

Source: WSJ reporting

60.     During the period leading up to the collapse of the auction rate securities market, the market did not function as a true competitive auction.  Real auctions--during which buyers and sellers meet and an interest rate is set based upon their interest--were not taking place in recent years.  Instead, the Wall Street firms in charge of the auctions--including Defendants--smoothed the process by bidding with their own capital rather than securing thousands of buyers to meet up with sellers every week or so. "Auction securities became a managed bidding system, not a true investor auction," Joseph S. Fichera, chief executive of Saber Partners, a financial advisory firm, has been quoted as saying. "The investor never knew how many investors there were, how often the brokerage firms were stepping in to make the system work, nor that the broker's support could stop all of a sudden." "If we had transparency in the system, investors could have judged the ability to sell in the individual auctions and bid accordingly." "It was kind of like a Moroccan bazaar," William Galvin, Secretary of State for Massachusetts, has said in describing the way Wall Street firms sold auction rate securities. "There was no real control, no warranty, no worry about backing up what you said." This "Moroccan bazaar" was highly lucrative for brokerage firms. As Mr. Fischera has said, commissions on auction rate securities were "much higher than for any other equivalent securities,"

61.     The auction rate securities market was highly concentrated, with regulatory and financial barriers that discouraged entry and the competition that entry could bring.  A January 30, 2008 Merrill Lynch email presented an overview of "closed end fund preferreds," the oldest and one of the most significant segments of the market.  It showed that out of the overall $57.94 billion in this segment, Merrill Lynch dominated by managing $24.63 billion (42%), with Citibank ($17.62 billion, 30.4%), UBS ($10.59 billion, 18.2%) following behind and Lehman trailing a distant fourth ($2.8 billion, 4.8%).  JP Morgan, Morgan Stanley, Goldman Sachs,

Wachovia RBOC, Deutsche Bank, and Bank of America are major players in other segments of the auction rate securities market.

62.     The auction rate securities market was also extraordinarily lucrative for leading players. The same internal Merrill Lynch email noted that "[s]ince 2001, the auction market desk has written approximately $13 Bn of preferred shares of closed end funds, earning $130MM of underwriting fees" and that "[f]rom 2003 to 2007, the equity syndicate desk underwrote $28.156 Bn and earned $1.267 Bn of fees."

63.     Thus, the underlying structure of the auction rate securities market was conducive to collusion.

**B.     Defendants' Maintenance of the Market for Auction Rate Securities**

64.     From 1984, when auction rate securities were first introduced, to 2006, the auction rate securities market had grown to more than $200 billion and the fees collected by the approximately two dozen broker-dealers running the market exceeded $600 million per year.

65.     It was known in and throughout the market that the perception that the auction market for auction rate securities was anything but liquid would cause investors to exit the market, and would therefore be extremely detrimental to any Defendants' ability to profit from the market. Thus, no Defendant could afford to, or could afford for any other Defendant to, indicate or signal to investors that the auction rate securities market was anything other than highly liquid. Joint action by Defendants was required in order to supply sufficient buyers in any given auction to prevent that auction from failing and to support the market. Each Defendant was aware that all were in active competition and that without substantially unanimous action, there was risk of a substantial loss of business and good will, but that with substantially unanimous action, there was the prospect of continuing to artificially maintain the market and

preserve increased profits.

66.     In order to sell as many auction rate securities as possible, Defendants represented to investors in their written materials and sales presentations that auction rate securities were essentially the same as cash and were highly liquid, safe investments for short-term investing. Defendants each knew that the attractiveness of auction rate securities to issuers depended upon investors' belief that such securities were essentially cash equivalents.

67.     Auction rate securities were attractive to issuers because, as long as the auctions did not fail as Defendants represented they would not, the auction rate securities allowed issuers to have long-term financing at short-term rates.

68.     By reason of Defendants' statements and conduct , it was believed and understood by issuers that there was a deep liquid market for these securities.  In addition, Defendants refrained from disclosing in the market that these securities were not cash alternatives like money market funds, but were instead, complex, long-term financial instruments with 30-year or longer maturity dates.

69.     Defendants also knew that the understanding about the cash equivalence of auction rate securities was only accurate if Defendants took necessary action to perpetuate the auction markets where auctions might otherwise fail.   Accordingly, Defendants collectively artificially propped up auction markets by buying auction rate securities offered for sale but for which there was insufficient market demand so that the liquidity of auction rate securities was maintained.

70.     At all relevant times during the Class Period, the ability of holders of auction rate securities to liquidate their positions and the ability of issuers to issue auction rate securities at rates below the maximum rates depended upon the maintenance of the auction market by

Defendants and their broker-dealers collectively.

71.     Defendants knew that their auction rate securities were receiving AAA ratings based upon the market belief and understanding about their liquidity and safety, despite the fact that Defendants were aware—and concertedly did not disclose—that the AAA ratings from rating agencies such as Fitch and Moodys did not provide protection to investors against a collective decision not to support the auctions.

72.     In order to conceal the illiquidity of the auction market, which could not support the billions of dollars in auction rate securities that Defendants were selling to investors on a daily basis, Defendants engaged in various practices termed "stabilization," which artificially maintained the market.

73.     In 2004, the Securities Exchange Commission ("SEC") began to investigate practices by which broker-dealers could influence the auction markets.  In an administrative proceeding dated May 31, 2006, the SEC found that the major broker-dealers engaged in various illegal practices to make it appear that the auctions were legitimate and successful when in reality they were not.  In 2006, the SEC entered into a consent decree with many of the major broker-dealers that required the broker-dealers to disclose certain practices and to cease engaging in other practices.  The consent decree indicated that in many cases, the broker-dealers collectively intervened in the market by preventing failed auctions to support their "no failed auctions" marketing claim.  The broker-dealers collectively had also set artificial "market" rates at levels they had chosen.

74.     The SEC also found:

        a.   Rearranging of bids through "netting" of in-house and buy-and-sell orders ahead of actual auctions in order to change the prioritization of bids, whereby broker-dealers

increased the priority level of their own customers' bids so that they would be filled, resulting in displacing of certain other investors' bids to affect the clearing rate;

        b.  Submission of bids after internal broker-dealer deadlines, and revisions of bids by broker-dealers after deadline, which also displaced other investors' bids and affected the clearing rate;

        c.  Collaboration by broker-dealers with certain customers whereby the broker-dealers asked those customers to bid at auction and then compensated them with higher than clearing rates in the secondary market; and,

        d.  Engagement by broker-dealers in "price talks" with certain customers whereby the broker-dealer would estimate the likely range within which an auction would clear, thereby placing certain customers at an advantage over others.

75.    As a result of the SEC findings, 15 broker-dealers were fined $13 million and ordered to "cease and desist" from such practices in the future. The findings evidence the role of collective broker-dealer action in manipulation and stabilization the market for auction rate securities. The SEC did not make any determination, nor did it purport to regulate, any horizontal collusion among the broker-dealers of auction rate securities.

76.    After the consent decree was entered, Defendants colluded to support markets for auction rate securities for months, knowing that they were not functioning properly and that they were in significant danger of collapsing. Despite this knowledge, in order to keep auctions from failing, broker-dealers continued to submit bids for their own accounts after receiving notice of the bids submitted by purchasers without disclosing this practice.

77.    Defendants concealed their role in the auctions and the auction markets, whereby they were acting simultaneously on behalf of (a) issuers, who had an interest in paying the lowest

possible interest rates; (b) investors, who were seeking the highest possible return on a purportedly liquid investment; and, (c) themselves, to maximize their returns on their holdings of the auction rate securities.

78.     Defendants also continued to conceal the fact that they and their broker-dealers routinely intervened in the auctions to prevent all-hold and failed auctions and that, without their intervention and artificial manipulation of the auction markets, many auctions would likely have failed, as a result of which investors would have been able to determine the true risk and liquidity features of auction rate securities.   To avoid the withdrawal of support for periodic auctions and to artificially maintain and stabilize the market for auction rate securities, Defendants concealed their true role in auction markets and the necessity of their participation to the market's perpetuation.

79.     A purpose of such collective action concerning the auction rate securities market was to allow the Defendants to coordinate the reduction of their holdings of such securities before they jointly "pulled the plug" on the market.  For example, in the last few months of the market, UBS created an Auction Rate Securities Working Group to study its options.  Before February 13, 2008, seven members of that group sold a collective $21 million of their personal auction rate securities after the working group had been formed.  Two of those members, David Aufhauser, former general counsel for UBS, and David Shulman, Global Head Municipal Securities Group and Head of Fixed Income Americas at UBS, have either resigned or been suspended from the company.  As New York Attorney General Andrew Cuomo has said, "[n]ot only is UBS guilty of committing a flagrant breach of trust between the bank and its customers, its top executives jumped ship as soon the securities market started to collapse, leaving thousands of customers holding the bag."

C.      **The Failure of the Market for Auction Rate Securities**

80.      In the summer of 2007, some auctions for auction rate securities backed by sub-prime debt began to fail, which accounted for approximately 2-6% of the auction rate securities market, began to fail.  The credit crisis that followed resulted, by mid-2007, in banks ceasing financing private equity deals and, as a result, the prices of U.S. residential real estate fell sharply.  Financial institutions, such as Defendants, began reporting billions of dollars in losses.  While demand for auction rate securities by corporate and institutional clients was declining, Defendants struggled to maintain the illusion of a healthy and liquid market for auction rate securities.  Accordingly, Defendants began purchasing large numbers of auction rate securities into their own inventories to ensure the auctions did not fail.

81.      In the fall and winter of 2007, more auctions began to fail as legitimate demand for auction rate securities virtually dried up and Defendants began to limit the amount of inventory of auction rate securities that they would take on.  Defendants knew that the market for auction rate securities was in danger of failing.

82.      For example, Merrill Lynch bond analyst Martin Mauro prepared a research report on August 22, 2007 warning of the dangers of auction rate securities.  It said investors "need to rely on other buyers in the market to redeem the securities at par."  The report was never published, because Frances Constable, the Managing Director in charge of Merrill Lynch's auction desk, squelched it. "I HAD NOT SEEN THIS PIECE BEFORE AND IT MAY SINGLE HANDEDLY UNDERMINE THE AUCTION MARKET," she said in an e-mail (replete with all capitalized letters) to two other Merrill Lynch employees later that day.  Ms. Constable demanded that the analyst retract and rewrite the report, which appeared the next day with

language added that rising rates made the securities "a buying opportunity." That same month, ,

Ms. Constable sent messages to an analyst during a conference call with financial advisers.

After a participant asked a question, she urged the analyst to "shut this guy down," adding: "He

is focusing attention away from your positive message." At the time she was conveying these

messages, Ms. Constable, alarmed by the potential failure of the market, wrote to a co-worker,

saying "[c]ome on down and visit us in the vomitorium!!"

83.     Likewise, while executives at UBS also identified the hazards of auction rate

securities in August of 2007, they simultaneously began to "mobilize the troops," holding more

than a dozen conference calls with salesmen and giving them new marketing materials to

promote the bonds, according to emails from David Shulman.  "The pressure is on to move

inventory," he said in an August 30 note.

84.     In an email of November 19, 2007, a Merrill Lynch executive wrote:

> Market is collapsing.  No more $2k dinners at CRU!!  The
> Financials are being invicerated! [*sic*]  More firings over at
> Citi...Inventory flooding the street.  Going to be a great '08 trading
> environment.  All we have to do is live!!

85.     Beginning in the fall of 2007 and continuing until February 2008, UBS had taken

on so much auction rate security inventory in the course of trying to prop up the auction rate

securities market that, on multiple occasions in 2007 and in 2008, it exceeded the amount of

capital it was authorized to use to support the auctions.  These extreme measures that were being

used by UBS to stabilize the market were not disclosed to investors.

86.     On November 21, 2007, Frances Constable emailed John Price, Head of Americas

Credit and Trading, and others at Merrill Lynch, indicating the difficulty Merrill Lynch was

having clearing all Merrill Lynch's auctions given the negative press about market conditions:

> Any combination of negative Bloomberg article about auction

> illiquidity, the ongoing downdraft of press about the monocline
> insurers that guarantee the entire municipal space in our market,
> equity prices of the dealer community and the GSEs [government-
> sponsored enterprises] undergoing a death spiral undermining
> retail investors confidence in our ability to support the auction
> business and two time the number of daily auctions might have
> been deadly but we got them all today.

87.     Even though a number of auctions failed in September 2007 and thereafter,

Defendants continued to collectively encourage investors to purchase auction rate securities and

maintain the belief and understanding that these securities were the same as cash or money

markets and were highly liquid, safe investments for short-term investing, without disclosure of

the true risks associated with auction rate securities.

88.     In December of 2007, Jeffrey Scruggs at UBS, who was responsible for

overseeing underwriting public finance for UBS, warned others at UBS in an email of "the

continued deterioration of the auction rate market."

89.     Defendants knew of collective problem they were facing in the market for auction

rate securities, and were aware of the need to jointly withdraw their support from the auction rate

securities market.  On January 23, 2008, Kevin Conery, Senior Director Preferred Strategist in

the Research Department at Merrill Lynch notified his boss, Mary Rooney, that auctions at

Lehman were failing, stating:

> ...Fyi, new crisis brewing on the auction side.  We've had 3 parties
> confirm that Lehman is dropping out of the auction business.
> Nothing like adding further illiquidity to an already illiquid market.

90.     In December of 2007, the Chief Risk Officer at UBS sent an email to its CEO,

recognizing the need for collective action:

> Watch our competitors closely; if they stop supporting auctions,
> we have much better freedom to stop [supporting auctions].

91.    Defendants kept up lines of communication with each other during this period in order to engage in such collective action.  As early as August 23, 2007, David Shulman of UBS (who has since been suspended), reported in an email on the efforts of JP Morgan and Citigroup -- like UBS -- to decrease their inventories of auction rate securities by mobilizing their national sales force to sell these products to their unsuspecting clients.  Similarly, on December 15, 2008, Mr. Shulman wrote an email about creating liquidity backstops for the market and said "I do believe this is being pursued as an option by BOA, CITI, JPM....will let you know what we find out as well."  A January 9, 2008 email from Joseph Scoby (UBS's Chief Risk Officer) refers to "discussions with citi" relative to the student loan segment of the auction rate securities market. One intercompetitor discussion is reflected in a February 9, 2008 email in which Edward Hynes (Institutional Sales Manager for UBS' Municipal Securities Group) related a conversation he had with a person from Citigroup, where the latter talked about the problems his company was facing in the auction rate securities market and what steps it was taking, as well as what Merrill Lynch was doing.  By the eve of the market collapse—February 12, 2008—Mr. Schulman was confidently noting how "our peers are working feverishly to restructure and to unload paper to institutions" and how UBS also needed to do its own unloading.  That same day, UBS' Group Executive Board held an "Extraordinary Audio Conference" in which the CEO and Group Chief Risk Officer of UBS participated.  The minutes of the conference reflected a discussion of whether UBS should "join the competitors...in failing auctions of student ARCs [auction rate certificates]."

92.    Defendants acted in a coordinated, parallel fashion to artificially support auction and to collectively prop up the market for auction rate securities, even when doing so was causing them to accumulate inventory as the market was deteriorating.

93.    On February 13, 2008, 87% of all auctions of auction rate securities failed when all of the major broker-dealers concertedly refused to continue to support the auctions.

94.    It was disclosed that UBS, the second largest underwriter of auction rate securities had decided no longer to support the auction market.  Virtually every other major broker-dealer, including Goldman Sachs, Lehmann Brothers, Citigroup and Merrill Lynch, among others, had also decided at the same time to withdraw their support for the auction market.  As a result of this withdrawal of support by all major broker-dealers simultaneously, the market for auction rate securities failed, rendering more than $300 billion of outstanding securities illiquid.

95.    When Defendants and their broker-dealers stopped artificially supporting and manipulating the auction markets, those markets immediately failed, resulting in:  (a) the auction rate securities becoming illiquid;  and (b) the issuers of those securities being obligated to pay maximum interest rates higher than those that would likely have prevailed had the Defendants continued to support the auctions and the auction markets continued.

96.    As Professor John C. Coffee, Adolf A. Berle Professor of Law at Columbia University, was quoted as saying: "[i]t was anomalous that the market suddenly dried up.  The question is, was there any collusion that led to people suddenly moving out of the market?  What would be most suspicious is if you see any kind of discussions between banks."  As set forth above, the Defendants in fact engaged in precisely these type of discussions.

97.    The collapse of the auction rate securities market did not stop defendants from seeing a further opportunity. When the market failed, many municipalities and other issuers were forced to pay interest rates approaching 20 percent, and they called their bankers looking to refinance the debt, which would generate new underwriting fees.  "We have a money making opportunity," Seema Mohanty, an investment banker at UBS, wrote to David Shulman on

February 14. "They are desperate." Mr. Shulman in an email sent that day called the refinancing of the bonds "'the single greatest opportunity in decades for us to leverage our banking relationships. This is a bankers dream market.'"

**D.    Investigations Into The Failure of the Market for Auction Rate Securities**

98.    Since February 13, 2008, state attorneys general have taken action against some of the players in the auction rate securities market for fraudulent behavior. On July 24, 2008, Andrew Cuomo, the New York Attorney General, sued UBS for deceptive sales of auction rate securities. Massachusetts Secretary of State William Galvin filed a similar action on July 26, 2008. On August 8, 2008, UBS announced a partial settlement by which it agreed to buy back $11 billion worth of auction rate securities from some investors (retail customers, charities, and small and mid-size businesses), as well as paying $150 million in civil penalties). UBS is also reportedly discussing settlement with other states and the SEC. Attorney General Cuomo announced a similar settlement with Citigroup on August 7, 2008, pursuant to which it agreed to buy back $7 million in auction rate securities from certain investors (as well as paying $100 million in civil penalties).

99.    On August 7, 2008, Merrill Lynch announced a voluntary buyback of auction rate securities from certain investors, a move that was criticized by Attorney General Cuomo. Merrill Lynch had also been sued by Secretary of State Galvin on July 31, 2008.

100.    On August 11, 2008, Attorney General Cuomo expanded his investigation to cover JP Morgan, Morgan Stanley, and Wachovia. Wachovia's Midwest offices have also been raided by Illinois state regulators. The Bank of America has also reportedly received subpoenas and civil investigative demands from various state and federal governmental agencies.

101.    On August 12, 2008, Attorney General Cuomo rejected as insufficient an offer by

Morgan Stanley to repurchase about $4.5 billion in auction rate securities from its retain clients, calling the proposal "too little, to late." Morgan Stanley had already agreed to buy back $1.5 million in auction rate securities from two municipalities in Massachusetts to settle claims there of improper sales.

102.    On August 14, 2008, Attorney General Cuomo announced settlements with JP Morgan and Morgan Stanley under which they would buy back $7 billion worth of auction rate securities and pay, respectively, $26 million and $35 million in penalties.

103.    On that same day, the New Hampshire Securities Bureau sued UBS Securities for fraud, alleging that the latter violated its obligations as underwriter, investment banker and broker-dealer to the New Hampshire Higher Education Loan Corporation, which issued bonds that were marketed as auction rate securities.

104.    On August 15, 2008, Attorney General Cuomo announced a settlement with Wachovia under which it would buy back $8.5 billion in auction rate securities and pay $50 million in penalties.

105.    On August 21, 2008, Attorney General Cuomo announced settlements with Merrill Lynch, Goldman Sachs, and Deutsche Bank AG under which they would buy back a total of $10 billion in auction rate securities and pay, respectively, $125 million, $22.5 million, and $15 million in penalties.

106.    RBOC is also in settlement discussions with state regulatory authorities.

107.    The settlements achieved so far cover only a portion of the auction rate securities market.

108.    "The image of firms being dragged to the table is destabilizing," Arthur Levitt, adviser to Carlyle Group and a former SEC chairman, was quoted as saying. "Very few issues

have shaken public confidence in the integrity of our markets as much as this."

109.    In addition to the investigations being conducted by state attorneys general, another investigation is ongoing. On August 21, 2008, Reuters reported that attorneys and investigators will be undertaking the on-site review for the 40 firms during the weeks of August 25 and September 8 to target firms with large amounts of auction rate securities in accounts. The probe is to enforce the rules of the Financial Industry Regulatory Authority ("FINRA"). Reuters indicated that a letter to the firms from FINRA said the investigators were asking firms to provide electronic lists of auction rate securities issues, auction failures, and identify employees on their auction rate securities desks. The letter sent to the firms stated, in part, "If applicable, identify all individuals who were involved in determining when the firm would place supporting bids or placed such bids." It also asks "whether the firm participated in surveying investor interest and providing 'price talk' guidance to customers."

## VIOLATIONS ALLEGED

110.    Plaintiff incorporates herein the foregoing allegations set forth above as if set forth fully herein.

111.    During the Class Period, the Defendants and their co-conspirators engaged in a continuing combination and conspiracy in unreasonable restraint of trade and commerce in the purchase, sale, and underwriting of auction rate securities. This conduct violated Section 1 of the Sherman Act, 15 U.S.C. § 1.

112.    The aforesaid combination and conspiracy consisted of parallel action on the part of Defendants and an understanding and concert of action among the Defendants and their co-conspirators, the substantial terms of which were to raise, fix, stabilize, and maintain at artificially high levels the prices at which Defendants sold auction rate securities throughout the United States, to artificially maintain and stabilize the market for such securities, and to refuse to

deal with Plaintiff and Class members once the collective decision and action was made and taken to withdraw support for the auction rate securities market on February 13, 2008.

113.    For the purpose of forming and effectuating the aforesaid combination and conspiracy, the Defendants and their co-conspirators actually did those things which they combined and conspired to do, including, among other things:

a.    concealing Defendants true role in artificially maintaining and stabilizing the market for auction rate securities;

b.    creating the belief and understanding that auction rate securities were essentially cash equivalents and safe investments for short-term investing;

c.    acting in parallel to intervene in auctions where demand was insufficient so as to support the market for auction rate securities; and,

d.    jointly withdrawing their support for the auction rate securities auctions on or about the same dates, thereby causing the failure of the auction market.

## EFFECTS OF THE CONSPIRACY

114.    As a direct and proximate result of the combination and conspiracy, the acts alleged herein, and other acts performed in furtherance of the conspiracy:

(A)    The market for auction rate securities was artificially maintained and manipulated by the Defendants;

(B)    The market for auction rate securities failed as a result of Defendants' simultaneous joint withdrawal from the market, causing antitrust injury to issuers; and

(C)    Issuers of auction rate securities from Defendants who were holding those securities as of February 13, 2008 were saddled with illiquid assets drawing below-market interest rates that they could not use for their intended purposes or reinvest and which, because the auction market for selling auction rate securities no longer exists, that they have little

prospect of selling other than at a substantial discount to their par value.

115.    Defendants' conduct is a *per se* violation of Section 1 of the Sherman Act.

## DAMAGES TO THE PLAINTIFF
## AND THE MEMBERS OF THE CLASS

116.    As a direct and proximate result of the unlawful conduct of the Defendants alleged herein, Plaintiff and the members of the Class were not able to issue, purchase, and sell auction rate securities at interest rates determined in a market absent manipulation and, consequently, have been injured in their business and property in that, *inter alia*, issuers of auction rate securities have been left with illiquid assets that they cannot either reinvest or use for their intended business purpose.

## FRAUDULENT CONCEALMENT

117.    Until at least February 13, 2008, Plaintiff and the members of the Class had no knowledge that Defendants were supporting, maintaining, stabilizing, and manipulating the market for auction rate securities, or violating the antitrust laws as alleged herein.  At that time, Defendants simultaneously withdrew their support for the auctions and the market for auction rate securities collapsed.

118.    Plaintiff and the members of the Class could not have discovered that Defendants were violating the antitrust laws at an earlier time by the exercise of due diligence because of Defendants' fraudulent and active concealment of the conspiracy.  This concealment included, but was not limited to, making representations to Plaintiff and the Class members that auction rate securities were a safe, liquid, short-term investment vehicle; failing to disclose to Plaintiff and members of the Class Defendants' true role in supporting, maintaining, stabilizing, and manipulating the market for auction rates securities; and, failing to disclose to Plaintiff and members of the Class the increasing difficulty encountered by Defendants in continuing to

artificially stabilize and support that market.

119.    Defendants' successful scheme in the market for auction rate securities was executed in a manner that precluded detection and was inherently self-concealing. So, as to wrongfully conceal their conspiracy, Defendants: (a) secretly acted to artificially stabilize and support the market for auction rate securities by intervening in auctions and manipulating the outcome of those auctions so that they would not fail and (b) did not disclose to Plaintiff or members of the Class their true role in the auction markets.

120.    Even a few days before the collapse of the auction rate securities market, Defendants were still falsely telling investors that they should continue to participate in the market. For example, on February 7, 2008, Merrill Lynch Research Analyst Kevin Conery told financial advisers, "[b]ut is it [the auction rate securities market] an area we think represents a good, conservative, reasonable investment? Yes, it is."

121.    Defendants also willfully destroyed relevant information in order to conceal their unlawful scheme. For example, Attorney General Cuomo's office said that Citigroup units destroyed recordings of telephone conversations concerning the marketing, sale, and distribution of those securities, which he had sought in an April 14, 2008 subpoena.
Attorney General Cuomo said Citigroup failed to notify the Attorney General's office about the destruction of the tapes, even though it learned in mid-June that recordings from its auction-rate desk had been destroyed. Attorney General Cuomo said that his office didn't learn of the destruction of the recordings until June 30, 2008 and it "significantly and materially" interfered with its probe. "Citigroup has informed the Attorney General's Office that it is likely unable to recover the lost information on the destroyed tapes," David A. Markowitz, Chief of the New York Attorney General's Investigative Unit wrote in a letter to Citigroup. "Verbatim records of

the most important witness statements during the most relevant period were therefore destroyed after the issuance and service of the subpoena."

122.  The applicable statute of limitations has been tolled by Defendants' fraudulent concealment of their conspiracy.

## CAUSE OF ACTION

123.  Plaintiff realleges and incorporates each and every allegation set forth above as if fully set forth herein.

124.  From May 12, 2003 through February 13, 2008, Defendants and their co-conspirators have combined, conspired, and/or contracted to restrain interstate trade in violation of 15 U.S.C. §1.

125.  In furtherance of the unlawful conspiracy, the Defendants and their co-conspirators have committed overt acts in furtherance of the conspiracy, contract, and/or combination, including:

(A)  Supporting, maintaining, stabilizing, and manipulating the market for auction rates securities;

(B)  Failing to disclose the true extent of their involvement in the market for auction rate securities;

(C)  Failing to disclose the deterioration of the market for auction rate securities;

(D)  Acting in parallel to support the market for auction rate securities by intervening in auctions where demand was insufficient; and,

(E)  Simultaneously withdrawing their support from the market for auction rate securities, thereby causing the failure of that market.

126.    As a direct and proximate result of the conspiracy, Defendants have restrained competition in the market for auction rate securities and injured Plaintiff and each of the members of the Class in their business and property in that members of the Class are now paying higher interest rates on or are holding more illiquid assets than they would have paid absent the concerted unlawful activity.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the Class defined herein, prays that:

A.    The Court determine that this action may be maintained as a Class action under Rules 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given each and every member of the Class;

B.    The Defendants' actions alleged herein be adjudged and decreed to be in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

C.    Plaintiff and the members of the Class recover their damages against each Defendant, jointly and severally, in an amount to be determined, and that this damage amount be trebled pursuant to 15 U.S.C. §15(a);

D.    That Plaintiff and the members of the Class, to the greatest extent allowed by law, be awarded pre-judgment and post-judgment interest at the highest legal rate  from and after the date of service of the first complaint alleging a combination, contract, or conspiracy in restraint of trade in the auction rate securities industry;

E.    Defendants be compelled to rescind at par the millions of dollars in auction rate securities transactions that they executed during the Class Period to those investors who have retained those securities;

F.     Plaintiff and the members of the Class recover their costs of this suit,

including reasonable attorneys' fees, as provided by law; and,

G.     Plaintiff and the other members of the Class be granted such other, relief

deemed proper to this Court

## JURY TRIAL DEMAND

Plaintiff demands trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of

all issues triable of right by jury.

Dated:        September 4, 2008

Respectfully submitted,

Robert G. Eisler (RE-1398)
Steig D. Olson (SO-0414)
**COHEN MILSTEIN HAUSFELD &
TOLL, PLLC**
150 East 52nd Street, 30th Floor
New York, New York  10022
212-838-7797
212-838-7745 (fax)

Michael D. Hausfeld
**COHEN MILSTEIN HAUSFELD &
TOLL, PLLC**
1100 New York Avenue, N.W.
West Tower, 5th Floor
Washington, D.C.  20005
202-408-4600
202-408-4699 (fax)

Michael P. Lehmann
Jon T. King
**COHEN MILSTEIN HAUSFELD &
TOLL, PLLC**
One Embarcadero Center
San Francisco, CA  94111

415-623-2048
415-433-5994 (fax)

William C. Carmody
Arun Subramanian
**SUSMAN GODFREY L.L.P.**
654 Madison Avenue, 5th Floor
New York, NY 10065-8440
Telephone:  (212) 336-8330
Facsimile:  (212) 336-8340

H. Lee Godfrey
**SUSMAN GODFREY L.L.P.**
1000 Louisiana, Suite 5100
Houston, TX 77002-5096
Telephone:  (713) 651-9366
Facsimile:  (713) 654-6666

Marc M. Seltzer
**SUSMAN GODFREY L.L.P.**
1901 Ave. of the Stars, Suite 950
Los Angeles, CA  90067-6029
Telephone:  (310) 789-3100
Facsimile:  (310) 789-3150

Attorneys for Plaintiff